# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CHARLES L. POLLARD,                          *

Plaintiff,                                   *

v.                                           *          Civil Action No. PJM-21-0636

GRACE MEDICAL CENTER, *et al.*,              *

Defendants.                                  *
                                           ***

## MEMORANDUM OPINION

Charles L. Pollard, incarcerated at Jessup Correctional (JCI), has filed suit pursuant to 42 U.S.C. § 1983, alleging delay and denial of medical care causing unnecessary pain and suffering in violation of the Eighth Amendment to the United States Constitution.  ECF No. 1.  Pollard brings this action against Defendants Grace Medical Center,[1] JCI Wardens Gang and Friday, Corizon Health Care ("Corizon"), and Corizon physician Dr. Vivien Dorsey. Pollard is seeking damages and injunctive relief, in the nature of medical care.

Defendant Grace Medical Center, Inc. ("GMC") filed an answer to the complaint and has moved to dismiss the claims, and the remaining Defendants have moved to dismiss the claims or alternatively for summary judgment in their favor.  ECF Nos. 9, 27, 32, 34.  Pollard has responded to each motion.  ECF Nos. 38, 43, 44.  GMC filed a reply to Pollard's response.  ECF No. 39.  Corizon and Dorsey also filed a reply to Pollard's response.  ECF No. 48.

---

[1] Defendant notes that they were improperly sued as Grace Medical Center, and are correctly Grace Medical Center, Inc.  ECF No. 27-1 at 1.  The Clerk will be directed to correct the docket to reflect the full name of this entity.  Further, it is undisputed that Bon Secours Hospital was renamed and is now Grace Medical Center.  The Court will refer to Bon Secours Hospital as Grace Medical Center.

The Court has reviewed the pleadings and will resolve the motions without a hearing. Local Rule 105.6 (D. Md. 2021).  For the reasons stated below, GMC's motion to dismiss is granted.  Corizon and Dorsey's motion to dismiss, or in the alternative for summary judgment, is denied.  Gang and Friday's motion to dismiss, or in the alternative for summary judgment, is granted.

## BACKGROUND

Pollard's verified complaint and attached exhibits detail events that took place while housed at JCI.  ECF No. 1.  Pollard's allegations regarding his medical care date back to 2010. The Court notes at the onset that Defendant Corizon became the contractual provider of medical services for individuals in custody in the Maryland state prison system on January 1, 2019. Wexford, who is not named as a Defendant, was the provider of medical services from July 1, 2012 through December 31, 2018.  *See* https://www.baltimoresun.com/politics/bs-md-board-prison-20181219-story.html.

Pollard's  medical concerns date back to August 2010, when he was admitted to GMC for removal of a lipoma on his back.  ECF No. 1 at 4.  Once at the hospital he received a diagnosis of lumbar hernia, and had surgery to repair the hernia with the placement of a hernia mesh.  *Id.* Defendant Dr. Dorsey describes a lumbar hernia as a "rare condition in which the tissues inside the abdomen protrude through a defect of the abdominal wall in the area near the lumbar spine." ECF No. 32-2 at 2.

At some point, the hernia mesh repair failed, and on January 11, 2013, Pollard was seen by a physician's assistant on sick call to discuss the status of a consultation request to be seen by a

surgeon.  *Id.* at 5; ECF No. 1-4 at 1.[2]  This began an eight year effort by Pollard to obtain relief for his condition.

On February 25, 2013, Pollard was seen by the on-site physician who noted his complaints of "nearly constan(t)" right lower back pain.  ECF No. 1-5 at 1.  Examination revealed deformity of the back and spine that was tender to the touch.  *Id.* at 2.  The physician indicated a request would be made for a surgery consultation for a lumbar herniation.  *Id.*

On February 28, 2013, Pollard had a chronic care visit for a surgical consultation.  ECF No. 1-6.  The physician noted that he would speak to the surgeon who had repaired the hernia in 2010 to get a recommendation for further management.  *Id.*  Over a period of time, Pollard was given Motrin and other medications that only temporarily eased his pain but did not repair his back.  ECF No. 1 at 5.  On March 3, 2014, Pollard wrote a letter to the Assistant Director of the Maryland Department of Health and Mental Hygiene complaining of the medical care he was receiving.  *Id.* at 5-6; ECF No. 1-7 at 1.  Pollard states in his letter that he is prescribed "massive amounts of Motrin" and although the JCI physician has several times requested that he receive a consultation with a surgeon, this has not taken place.  ECF No. 1-7 at 1.  On a May 16, 2013 chronic care visit it was noted there was an "outpouching" in the lumbar region and the area had grown in size from 7.5 cm by 6 cm to 11 cm by 7 cm since February 25, 2013.  ECF No. 1-5 at 2; ECF No. 1-8 at 2.  The physician made another request for a consultation to evaluate and "fix" the lumbar hernia, and for general surgery. ECF No. 1-8 at 2.

---

[2] Limited medical records were provided by Pollard as exhibits to his complaint that date back to 2013.  Defendants Corizon and Dorsey do not appear to have provided medical records that date prior to January 2019.

Over one and a half years passed, and on December 23, 2014, Pollard was sent to GMC for a CT scan of the lumbar spine.  ECF No. 1 at 6;  ECF No. 1-9.  The CT scan noted arthritic and degenerative changes to the spine.  ECF No. 1-9.

Another year passed, and on January 5, 2016, Pollard received a consultation from Dr. Onabajo to evaluate "an increasing large mass on the mid back from 2007."  ECF No. 1-10 at 1. Dr. Onabajo noted that since the 2010 hernia surgery, the swelling had gotten worse or larger with constant pain, that Pollard had difficulty walking straight without having to bend, and the pain was affecting Pollard's gait.  *Id.*  Pollard was referred again for an MRI or CT scan.  *Id.*

On March 23, 2016, Pollard received another MRI of his spine at GMC.  ECF No. 1 at 6. The MRI noted that in the right posterior paraspinal region there was a "fat-containing sac … associated mesh material, likely from prior lumbar hernia repair" and measurements were provided.  ECF No. 1-11 at 2.  Also noted was advanced degenerative disease. *Id.*

On October 14, 2016, Pollard had another consultation with Dr. Onabajo.  ECF No. 1 at 6. Based on the March 2016 MRI, Dr. Onabajo referred Pollard to an orthopedic surgeon to be evaluated for a possible hernia repair.  ECF No. 1-12 at 1.

On February 8, 2017, Pollard had a consultation with Dr. DeRosa.  ECF No. 1 at 7.  Dr. DeRosa noted that Pollard was "very symptomatic with disk disea(s)e and the lipoma.  ECF No. 1-13.  He indicated that the lipoma was "harder than one would expect" and the pain and potential for malignancy justify removal.  *Id.*  Dr. DeRosa made a surgery request for a "symptomatic lipoma resection."  *Id.*

On June 1, 2017, Pollard was seen for a chronic care visit with Dr. DeRosa.  ECF No. 1-14.  Dr. DeRosa noted that Pollard still needed to be seen for the removal and repair of the hernia, as the physician was unavailable when he last went to the clinic.  *Id.* at 1-2.  The lesion was "tender"

and was now 15 by 11 cm in size.  *Id.* at 2.  Pollard was rescheduled for the surgery clinic.  *Id.*  On

June 2, 2017, another MRI was performed.  ECF No. 1 at 7.

It is unclear what medical care Pollard received related to the hernia between June 2017

and January 2019, as the medical records have not been provided, nor have allegations been

presented by Pollard.  The next record of relevance is dated January 31, 2019.  ECF No. 32-20,

MR 000630-000631.[3]  By now, Corizon held the contract to provide medical care.  A request for

a general surgery consultation to examine Pollard's lumbar hernia was approved.  *Id.*  It was noted

that Pollard was taking 2400 mg per day of Motrin at that time.  *Id.*, MR 000630.

Nearly four months later, on May 21, 2019, Pollard had a health assessment and reported

that the lump was painful with "intensity up to 10/10."  ECF No. 32-3, MR 000009.  He was taking

up to four 800 mg tablets of Motrin daily for pain.  *Id.*  On June 19, 2019, at a sick call visit, Pollard

continued to complain of pain in his back and the growth of the lump. On assessment, "a huge

lump was noted" on his back.  *Id.*, MR 000017.  Pollard was referred to the chronic care doctor.

*Id.*

On July 2, 2019, Pollard was seen by the medical department and a general surgery

consultation request was made to evaluate the right back herniation.  *Id.*, MR 000019.   It was

noted that although Pollard has lower lumbar spondylosis and degenerative disease the "pain seems

to be emanating from the hernia" which "appears hard and immovable now."  *Id.*  Pollard reported

concern with taking 2400 mg of Motrin daily for pain.  *Id.*  The general surgery consultation

request was approved and an appointment scheduled for July 30, 2019. ECF No. 32-20, MR

000634-000635.

---

[3] The Court will reference the medical record page number stamped on the lower right hand
corner of the exhibits provided by Defendants Corizon and Dorsey.

On July 30, 2019, Pollard was seen by a consultant, Dr. Hannah, who documented that the case is "complex" and requested that Pollard be seen by the University of Maryland Medical System ("UMMS") for "surgery and treatment."   ECF No. 32-4, MR 000067.   The record submitted by Defendants Corizon and Dorsey does not appear to include the consultant report, and is referenced instead in a medical progress note.[4]  *Id.*

Over two months later, on October 4, 2019, Pollard was seen on sick call to inquire when he would receive the UMMS consultation requested Dr. Hannah.  ECF No. 32-3, MR 000034.  On October 5, 2019, a general surgery request was then made by the medical provider.  *Id.*, MR 000035; ECF No. 32-4, MR 000036.  Pollard's prescription for Motrin 800 mg, three times daily, was renewed through February 5, 2020.  ECF 32-4, MR 000045.

On October 5, 2019 an MRI was requested by the medical provider to prepare for an appointment with UMMS.  *Id.*, MR 000046. On  October 21, 2019, Pollard was seen by Dr. Kavic at UMMS Digestive Health Clinic.  ECF No. 32-21, MR 000651-652.  Dr. Kavic noted that the bulge from the surgery has "recently has become more painful. The pain is dull, moderate intensity, well-localized, non-radiating, and associated with abdominal strain."  *Id.*, MR 000651.  The physician recommended operative repair of the hernia "at the patient's earliest convenience."  *Id.,* MR 000652.

To prepare for the surgery, on October 30, 2019, another MRI was conducted at GMC.  ECF No. 1 at 7.  The MRI noted "only a slightly increase in size" of the relevant area from the

---

[4] The Court notes that the 674 page medical record provided by Defendants Corizon and Dorsey does not include an index as required under Local Rule 105.5.  Defendants filed 19 separate items, each containing of portion of medical records, and each item is identically labeled "Exhibit A-1."  ECF No. 32-3 – 32-21. This quantity of entries should include an index with proper labeling to identify the content of each item, including the medical record page numbers, so that they can be easily accessed by the court.

prior examination on October 2, 2017.  ECF No. 1-16 at 1.  Degeneration and spondylarthritis was also noted.  *Id.* at 2.

On December 16, 2019, a request was made by the on-site medical provider for surgical repair of the lumbar hernia as had been recommended two months earlier by the UMMS surgeon Dr. Kavic.  ECF No. 32-4, MR 000054.  On January 6, 2020, the request was reviewed by Dr. Dorsey, who is a Utilization Management Medical Director ("UMMD") employed by Corizon. ECF No. 32-2 at 1.  In her role as a UMMD, Dr. Dorsey reviews and provides approval for most specialized services.  *Id.*  Dr. Dorsey denied the surgery request noting, "[b]ased on the information provided, medical necessity not demonstrated at this time. Consider conservative measures for pain control."  ECF No. 32-20, MR 000632.

On January 18, 2020, an administrative note was placed in Pollard's medical record noting that although Pollard had degenerative disease and spondylosis, his pain seemed to be coming from the hernia.  ECF No. 32-4, MR 000067.

On January 21, 2020, Pollard filed a complaint with JCI under Maryland's Administrative Remedy Procedure ("ARP") pertaining to his inability to receive adequate medical care for his hernia repair.  ECF No. 1 at 8; ECF No. 1-2.  *See* Md. Code Regs. § 12.02.28.02(B)(1), (D) (2018).

On February 5, 2020, Pollard was seen on sick call complaining of lower back pain and that he was not receiving pain medication that had been prescribed on January 18, 2020.  ECF No. 32-5, MR 000072.  The medical provider confirmed that a pain medication, Lyrica, had been approved and he was advised to check on the status with the pharmacy nurse.  *Id.*

On February 25, 2020, Defendant Warden Gang issued a response to Pollard's ARP, finding Pollard's claim "meritorious in part" while also noting that "utilization management" has to approve surgery. ECF No. 1-2 at 4.  Noted were three pain medications Pollard was taking,

Baclofen, Ibuprofen and Lyrica.  *Id.*  Gang advised Pollard to follow up in chronic care for "further evaluation."  *Id.*  Gang's response also states that the Health Services Administrator "will ensure request for additional information be submitted with consults to prevent a delay in approval/disapproval."  *Id.*

Two months after the surgery was denied, on March 7, 2020, Pollard was seen for a chronic care visit  *Id.*, MR 000079.  It was noted that Pollard had been denied surgery and utilization management had recommended pain management.  *Id.*  Pollard had been started on the additional pain medication Lyrica which he reported was inadequate.  *Id.*  He reported having difficulty with activities of daily living ("ADL's") and ambulation.  *Id.*  At this appointment, the dosage of Lyrica was doubled from 100 to 200 mg per day, and Motrin was continued at 800 mg, three times per day, through July 7, 2020.  *Id.*, MR 000079-80.

Six weeks later, Pollard was seen on sick call on April 20, 2020, complaining of pain due to the lump along the right border of his lumbar spine.  *Id*., MR 000081. Pollard reported that he was unsuccessful in getting surgery approved, and he had numbness in the right lower extremity, and pain that affects his gait.  *Id.*  It was noted that a cane would help him with ambulation.  *Id.*

Over two months later, on July 2, 2020, Pollard was provided with a cane.  ECF No. 1-19. On July 16, 2020, he was seen for chronic care, continued to report pain at "8/10" on a regular basis, and was using his cane. ECF No. 32-5, MR 000086.

On October 22, 2020, three months after Pollard started using a cane, and nine months after Dr. Dorsey denied the surgery, Pollard was seen for medical care.  He continued to report that he the pain medication provided inadequate relief.  ECF No. 32-6, MR 000110.

On February 3, 2021, Pollard was seen for medical care.  ECF No. 32-6, MR 000124. Noted was the failed surgery repair to his hernia in 2010, and a return of pain in 2013.  *Id.*

In March 2021, eight years after his condition was diagnosed, and 14 months after his request for surgery was denied by Dr. Dorsey, Pollard filed his complaint in this case. ECF No. 1. He states that his condition has deteriorated and he can no longer fully control his bowel movements and is having trouble walking. ECF No. 1 at 9. He takes pain medication that no longer provides relief, and is in "intense constant pain all day long." *Id.*

Following the filing of the complaint, on March 11, 2021, Pollard was seen on sick call. ECF 32-6, MR 000129. Pollard presented with a "tennis-ball size lump" on the right border of the lumbar spine, and was using a cane due to back discomfort. *Id.* He reported pain intensity to be 9/10 and constant. *Id.* Pollard stated that Lyrica "takes off the edge" but other prescribed medications, Tramadol and Baclofen, make him throw up and do not help. *Id.* On that date, an additional request was made by the medical provider for Pollard to receive a surgical evaluation for the hernia surgery. *Id.*, MR 000127-128. (141). The request was approved by Dr. Dorsey on that date. ECF No. 32-20, MR 000642

On March 24, 2021, Pollard was transported from his work station to the medical department in a wheelchair due to severe back pain with decreased range of motion. *Id.*, MR 000132-135. On April 5, 2021, Pollard was seen at UMMC by Dr. Kavic who again recommended surgical repair, as he had on October 21, 2019, nearly eighteen months earlier. *Id.*,; ECF No. 32-21, MR 000651-656. Paperwork prepared by UMMS for the surgery noted it to be "urgent." *Id.*, MR 000657.

On April 6, 2021, the medical department again requested approval for the hernia surgery, and that it be scheduled "as soon as it is feasible." ECF No. 32-6, MR 000141. On April 7, 2021, the surgery was approved by "M Bartels" with utilization management. ECF No. 32-21, MR 000645.

On May 19, 2021, Pollard received the surgery, over sixteen months after the prior denial. *Id.*, MR 000632, 000663-664.  The hernia and mesh were repaired with no complications.  *Id.*, MR 000663-664.

On June 2, 2021, Pollard was seen by the on-site medical provider. He reported he was doing well and pain was controlled.  ECF No. 32-8, MR 000184.  Pollard was seen again on June 21, 2021, on site after a postoperative visit. *Id.* at 000188.  He reported he was doing well and had been advised to gradually increase activity.  *Id.*  On June 30, 2021, Pollard was seen again on site by the medical provider.  *Id.*, at MR 000193.  He reported that he was doing fine and the surgeon was pleased with his recovery. *Id.*  Pollard stated that his pain was in control, and he requested that the provider discontinue his prescription for Baclofen.  *Id.* The dosage was reduced.  *Id.*

On August 18, 2021, Pollard was seen for a chronic care visit.  *Id.* at MR 0000197. It was noted that his back pain is "not good controlled and take ibuprofen every day."  *Id.*  The medical notes also state that Pollard will be contacted for a preoperative evaluation and preparation when his time and date for surgery is arranged.  *Id.*   There is no indication as to the nature of further surgery.  *Id.*

Pending are GMC's motion to dismiss the claims, and the remaining Defendants' motions to dismiss the claims or alternatively for summary judgment in their favor.

### STANDARDS OF REVIEW

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Legal conclusions or conclusory statements do not suffice.  *Id.*  The Court must examine the complaint

as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Pollard was placed on notice that Defendants Corizon, Dorsey, Gang and Friday sought summary judgment and responded in opposition. ECF Nos. 43, 44. Accordingly, the Court treats those motions as ones for summary judgment. *See, e.g., Moret v. Harvey*, 381 F. Supp. 2d 458, 464 (D. Md. 2005).

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Id.* at 248-49.

## DISCUSSION

**A. GMC**

Pollard's claims, fairly read, raise civil rights violations brought pursuant to 42 U.S.C. § 1983.  GMC's motion to dismiss also addresses a state law medical negligence claim in the event the claims can be characterized in this manner (ECF No. 27-1 at 6-7) and Pollard responds to GMC on these points (ECF No. 30 at 5-6).

GMC asserts in its motion that Pollard's constitutional claims arise from medical treatment that took place in 2010, 2014 and 2016, and are time barred; state law medical negligence claims are also time barred; and state claims are further barred because Pollard failed to comply with the Maryland Health Care Malpractice Act. Md. Code, Cts. & Jud. Proc. §3-2A-01 *et seq.* ECF No. 27.  The court's analysis begins and ends with GMC's statute of limitations defense.[5]

Section 1983 does not contain a statute of limitations. Thus, to determine whether a § 1983 claim was timely filed, courts look to the statute of limitations from the most analogous state-law cause of action.  *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, 575 U.S. 983 (2015); *see also*

---

[5] Because GMC's motion will be granted holding Pollard's claims are time barred, its other defense will not be addressed.

42 U.S.C. § 1988(a) ("[I]n all cases where [the laws of the United States] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies ... the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil ... cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause[.]").

A suit filed pursuant to 42 U.S.C. § 1983 constitutes a personal injury action.  *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise.  Md. Code (2020 Repl. Vol.), § 5-101 of the Courts & Judicial Proceedings Article ("C.J."). *See also* Md. Code, Cts. & Jud. Proc. Art. § 5-109(a) ("An action for damage for injury arising out of the rendering or failure to render professional services by a health care provider . . .  shall be filed with the earlier of:  (1) [f]ive years of the time the injury was committed; or (2) [t]hree years of the date the injury was discovered.")

"Limitations statutes ... are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy."  *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *see Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983).  In Maryland, "[a]s a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit."  *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

13

Although the Maryland statute of limitations applies, the matter of when a cause of action has accrued under § 1983 is a federal question.  *Nassim v. Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir. 1975)); *see also McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149, 2155 (2019). "An accrual analysis begins with identifying 'the specific constitutional right' alleged to have been infringed."  *McDonough*, 139 S. Ct. at 2155 (quoting *Manuel v. Joliet*, ___ U.S. ___, 137 S. Ct. 911, 920 (2017)).

A claim accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nassim*, 64 F.3d at 955 (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)); *see Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020) (stating that a cause of action accrues when the plaintiff "has actual or constructive knowledge" of the claim).  But, accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *Kubrick*, 444 U.S. at 122 (discussing discovery rule in the context of the Federal Tort Claims Act, which requires notice to the government "within two years after such claim accrues"); *see also Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 742 (4th Cir. 1990) (en banc) ("The clear import of *Kubrick* is that a claim accrues ... when the plaintiff knows or, in the exercise of due diligence, should have known both the existence and the cause of his injury."); *Gilbert v. United States*, 720 F.2d 372, 374 (4th Cir. 1983). However, "the answer is not always so simple." *McDonough*, 139 S. Ct. at 2155. "Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date." *Id.*

Nevertheless, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," the so-called discovery rule is sometimes used to determine the date of accrual. *See*

*Sheff*, 382 Md. at 244, 854 A.2d at 1275; *Frederick Road Ltd. P'ship*, 360 Md. at 95, 756 A.2d at 973. "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.,* 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders*, *Inc.*, 358 Md. 435, 444, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012). Notably, "[t]his standard ... does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.' " *Dual Inc.*, 383 Md. at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano*, 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Wash.*,114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)).

A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and ... a diligent investigation would have revealed that the plaintiffs were victims of ... the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1104 (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448-49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981). In Maryland, "[c]onstructive notice or knowledge will not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

The parties do not disagree as to when the events took place, but they do disagree on how the time calculation should be made. Pollard states that his hernia surgery took place at GMC in August 2010. ECF No. 1 at 4. Beginning on January 11, 2013, he started to be treated

by the medical department at JCI for back pain because the surgery had failed. *Id.* at 5.  Pollard

was seen by the medical department on a number of occasions.  *Id.*  Eventually, on December

23, 2014, he was sent to GMC for a CT scan but "nothing was done to help Plaintiff."  *Id.* at 6.

On March 23, 2016, Pollard returned again to GMC for an MRI on his back.  *Id.*  The MRI

indicated there were problems in the same area where the hernia repair had been done, but

surgery was not performed to repair the problem.  *Id.*  By June 2017, a recommendation was

made to have Pollard undergo surgery at UMMS to repair the hernia.  *Id.* at 7.  To prepare for

surgery, on October 30, 2019, an MRI was conducted at  GMC.  ECF No. 1 at 7.  The MRI

noted "a slightly increase in size" of the relevant area from the prior examination on October 2,

2017.  ECF No. 1-16 at 1.

GMC asserts Pollard was aware of the failed surgery when a CT scan was done on

December 23, 2014 and again when an MRI was done on March 23, 2016, and GMC did nothing

to fix the situation.  ECF No. 27-1 at 2; ECF No. 1 at 6.  GMC acknowledges in its reply that

Pollard's cause of action accrued, at the latest, on June 1, 2017, when the need for corrective

surgery was documented.  ECF No. 39 at 2; ECF No. 1 at 7.

Giving Pollard the most generous reading, his claim accrued at the latest on June 1,

2017, when the need to correct the surgical repair was documented. The MRI taken on October

30, 2019, took place significantly after the date on which Pollard was aware of the medical

issue and it had been recommended that he receive surgery.  Pollard's complaint filed in March

2021, was well beyond the statute of limitations for both state and federal claims.

GMC's motion to dismiss will be granted, and claims against them will be dismissed as

time barred.

**B. Defendants Corizon Health and Dr. Dorsey**

Corizon Health argues that Pollard has failed to state a claim against Corizon because there is no respondeat superior liability and Pollard has not alleged that Corizon has official policy or custom that caused a deprivation of his rights. Dr. Dorsey argues that Pollard has failed to state a claim against her because his allegations do not rise to the level of deliberate indifference.

Pollard's alleged denial of medical care implicates his Eighth Amendment right to be free from "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To succeed in the claim, Clark must demonstrate that each defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (describing the applicable standard as an "exacting"). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d at 219, 225 (4th Cir. 2016). Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)).

Deliberate indifference specifically requires the plaintiff to show that objectively, he was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (internal quotation marks and ellipses omitted).

Proof of an objectively serious medical condition, however, does not end the inquiry.  The plaintiff must also demonstrate that defendant's exhibited "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839–40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted."  *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time.  *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson*, 775 F.3d at 179.  That said, "negligence or malpractice on the part of. . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998).  Adequacy of treatment in this context "is one of medical necessity and

not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44,

47–48 (4th Cir. 1977).

Relevant here, this Court has consistently held that deferral of surgery in favor of

conservative treatment alone does not amount to deliberate indifference. *See Dyson v. Wexford

Health Sources, Inc.*, No. TDC-19-0307, 2020 WL 1158791, at *7 (Mar. 10, 2020), *aff'd*, 2021

WL 5357490 (4th Cir. 2021); *Rivera v. Wexford Health Sources, Inc.*, No. DKC-17-666, 2018 WL

2431897, at * 4 (May 30, 2018); *Dent v. Wexford Health Sources, Inc.*, No. CBB-15-206, 2017

WL 930126, at *8 (D. Md. 2017), *aff'd sub nom, Dent v. Ottey*, 698 F. App'x 99 (Mem) (4th Cir.

2017); *Jennings v. Ottey*, No. WMN-14-1736, 2015 WL 4496431, at *5 (July 22, 2015), appeal

dismissed, No. 15-7194 (4th Cir.).  However, delay of treatment in the face of significant pain is

the kind of harm sufficient to support a finding of deliberate indifference. *Sharpe v. S.C. Dep't of

Corr.*, 621 F. App'x 732, 733–34 (Mem) (4th Cir. 2015); *see Formica v. Aylor*, 739 F. App'x 745,

755 (4th Cir. 2018) (collecting cases).

It is undisputed that Pollard suffered from a serious medical need.  The parties instead focus

on whether the record, viewed most favorably to Pollard, could support a finding of deliberate

indifference in response to his needs.

**Dr.  Vivien Dorsey**

In support of the motion, Dr. Vivien Dorsey provided a declaration.  ECF No. 35-2.  She

has worked for Corizon since January 2017 as a Utilization Management Medical Director

("UMD").  ECF No. 35-2 at 1.  In this role, she reviews and provides approval for requests for

specialized services.  *Id.*

Dr. Dorsey states that she denied the request for surgical repair "because the records I

reviewed, including Dr. Kavic's note, did not indicate that conservative treatment to control the

patient's pain had previously been attempted." *Id.* at 5.  She reviewed only the provider's request for a surgical repair of the hernia, which was based on the recommendation of a surgeon, and the "note" of Dr. Kavic.  *Id.* at 4.  She further states that anti-inflammatory medication is effective for many patients to treat hernia pain and she was "not aware" if Pollard had been on this course of treatment.  *Id.* at 5.  Fourteen months later she approved a surgical evaluation and she notes this is because this time the provider's request stated that conservative measures had proven unsuccessful.  *Id.* at 7-8.

Dr. Dorsey further states that although Pollard reported doing well in the two months post surgery, in the third month he reported that "his back pain was not well-controlled and that his pain was the same as before."  *Id.* at 9.  Dr. Dorsey concludes that this indicates that Pollard's prior complaints "did not arise from his lumbar hernia" and the care Pollard received "did not cause him any injury or  harm" *Id.*

At this stage a genuine dispute of fact exists as to whether Dr. Dorsey was deliberately indifferent to Pollard's serious medical needs in violation of his Eighth Amendment rights.  Dr. Dorsey states that she was justified in denying surgery to Pollard after review of an extremely limited medical record, although Pollard had received medical care at JCI for his hernia for a decade. There is no indication she sought additional information from Corizon or consulting providers before making a decision.  Another sixteen months passed until the surgery was finally approved by utilization management and Pollard had the surgery.  In the interim, Pollard continued the cycle of pain, lack of relief from medication, and deterioration in mobility necessitating the use of a cane.

At this stage, a genuine dispute of fact exists as to whether Dr. Dorsey was deliberately indifferent to Pollard's serious medical needs in violation of his Eighth Amendment rights. Summary judgment absent discovery is denied as to Dr. Dorsey.

**Corizon**

Corizon argues that it is entitled to summary judgment because the record fails to establish anything more than mere supervisory liability, which is legally unavailable for § 1983 claims.  *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983).  Where a private corporation performs functions otherwise reserved for a state actor, it may be held liable for carrying out those functions pursuant to a "custom, policy, or practice" that "violate[s] a plaintiff's constitutional rights."  *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014); *see Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978); *see also Haughie v. Wexford Health Sources, Inc.*, No. ELH-18-3963, 2020 WL 1158568, at *15 (D. Md. Mar. 9, 2020) (*citing Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003).   Accordingly, claims against Corizon may only proceed if record evidence supports that "its policy or custom . . . is (1) fairly attributable to the [corporation] as its 'own,' . . . and is (2) the 'moving force' behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1386–87 (4th Cir. 1987) (citation omitted).  The claim thus survives if "certain affirmative decisions of [the corporation's] individual policymaking officials, or [] certain omissions on the part of policymaking officials [] manifest deliberate indifference to the rights of citizens."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *see also Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

At this stage in the proceedings, Pollard has presented enough information to allow for discovery regarding the § 1983 claim against Corizon.  On-site providers employed by Corizon are required to rely on its procedure requiring approval for consultations and surgery by utilization

management.  This is how decisions are made concerning the care provided to inmates. In this case, the decision made by utilization management to deny surgery was contrary to the requests of on-site providers who made numerous requests for consultations, and also contrary to the recommendations of consulting physicians.  The process also allowed decisions to be made by utilization management with minimal information on a patient's medical history, even though Corizon had access to in depth medical records containing medical history and prior treatment.

Pollard should have an opportunity to develop facts to indicate if Corizon's process of utilization management constitutes an unconstitutional policy, custom, or practice resulting in delay or denial of necessary medical care with deliberate indifference.  The motion as to Corizon is denied.

### C.  Wardens Gang and Friday

Pollard states that Gang and Friday were the Wardens when events complained of took place.  Wardens Gang and Friday argue that claims against them should be dismissed because Pollard has failed to establish a § 1983 claim, including a claim for denial of medical care; that there is no respondeat superior liability; and they are entitled to Eleventh Amendment and Qualified Immunity.

Pollard seeks to hold the Wardens responsible for inadequate medical care based on a Warden's overall responsibility for the health of inmates. ECF No. 1 at 2-3.  More specifically he alleges that because Warden Gang responded to his medical grievance, and found his claims to be meritorious in part, he is personally liable for the delay in the surgery that followed.  *Id.* at 11.  In regard to Warden Friday, he succeeded Warden Gang and was the Warden when Pollard filed his complaint.

In the Maryland prison system, inmate medical care is provided by privately contracted medical care providers.  ECF No. 34-1 at 1; ECF No. 34-2 at 1.  Pollard does not allege that Warden Gang or Friday, who are not licensed health care providers, were personally involved in the provision of medical care to Pollard or any other inmate.  Warden Gang's Response to Pollard's grievance, however, indicates there was some acknowledgement that medical care may have been delayed due to the lack of information provided by the on-site medical provider to utilization management.  The Response was found to be meritorious in part and notes that the Health Service Administrator will make sure that all requests for consultations include "additional information" to prevent delay.  ECF No. 1-2 at 4.

In declarations, Gang and Friday each state, without dispute, that they have no authority to make decisions relating to an inmate's medical care or to order the medical staff to prescribe any particular medication or perform any particular medical procedure.  ECF Nos. 34-2 at 1; 34-3 at 1. They each also state that they have no responsibility under the medical company's contract to monitor the provision of medical services to inmates.  *Id.*

It is firmly established that the doctrine of vicarious liability, or *respondeat superior*, does not apply to § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no *respondeat superior* liability under § 1983).  Particularly where a warden was not the supervisor of any of the medical personnel, they cannot be found liable pursuant to 42 U.S.C. § 1983 unless they participated personally in the deprivation of constitutional rights.

Wardens Gang and Friday did not have any personal involvement in providing medical care to Pollard or in the decision to allow Pollard to receive surgery.  To the extent that Warden Gang played a role in the review of Pollard's ARP relating to his medical care, including acknowledging that there may have been some delay in the processing of consultation requests, such

involvement does not amount to sufficient personal participation in the denial of medical care to support liability under § 1983. Correctional personnel may rely on the judgments of medical providers on the appropriate medical treatment to provide. *Miltier v. Beorn*, 896 F.2d 848, 855 (4th Cir. 1990).

Defendants Warden Gang and Friday's motion will be granted, and claims against them will be dismissed.[6]

## IV.     Conclusion

For the foregoing reasons, GMC's motion to dismiss is granted. Corizon and Dorsey's motion, construed as a motion for summary judgment, is denied. Gang and Friday's motion, construed as a motion for summary judgment, is granted. Claims against Defendants Corizon and Dr. Dorsey will proceed. The Court will appoint pro bono counsel to represent Pollard. A separate Order follows.

8/23/22
Date

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

---

[6] Because Warden Gang and Friday's motion will be granted for failure to state a claim, their other defenses will not be addressed.

24